**Opinion issued April 11, 2013**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-11-00325-CV

———————————

**MINER DEDERICK CONSTRUCTION, LLP, Appellant**

**V.**

**GULF CHEMICAL & METALLURGICAL CORPORATION, Appellee**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-66374**

---

## OPINION ON REHEARING

Appellant Miner Dederick Construction, LLP ("Miner Dederick") has filed an amended motion for rehearing. We deny the motion for rehearing. We withdraw our December 6, 2012 opinion and judgment and issue the following opinion and a new judgment in their stead.

This appeal arises from a construction defect suit brought by appellee Gulf Chemical & Metallurgical Corporation ("Gulf") against Miner Dederick. Following a jury trial, the trial court rendered judgment against Miner Dederick in favor of Gulf, awarding it actual damages and attorney's fees.

Identifying eleven issues, Miner Dederick challenges the trial court's judgment. Among these issues is Miner Dederick's assertion that the trial court erred by failing to find that Gulf had engaged in spoliation of evidence. Miner Dederick also challenges the trial court's grant of summary judgment on its counter-claim for breach of contract.

We hold that the trial court abused its discretion when it failed to find that Gulf had spoliated evidence vital to Miner Dederick's defense of Gulf's claims. We further hold that summary judgment on Miner Dederick's counter-claim was appropriate. Accordingly, we reverse and remand, in part, and affirm, in part.

## Background Summary

Gulf engages in the business of recycling spent catalyst generated by oil refineries. Gulf processes the catalyst by extracting metal from it. Gulf then sells the metal on the open market.

Before being processed by Gulf, the catalyst is considered a hazardous material. Gulf stores the catalyst in a hazardous waste building called "Containment Building 2" or "CB2." The catalyst has a granular texture and often

2

appears to be oily, containing free liquids, such as oil and water. It is not uncommon to see an oily liquid pooling on the floor of CB2, which has drained from the spent catalyst.

In early 2005, Gulf decided to expand CB2 to increase its storage capacity for the catalyst. Gulf contracted with Ashkar Engineering Corporation, a structural engineering design services company, to engineer and to design the expansion of CB2. Ashkar Engineering provided the drawings and specifications for how the CB2 expansion should be constructed.

Ashkar Engineering's drawings and specifications required that a new concrete foundation be poured for the expansion. The new foundation would be attached to CB2's original foundation by a 140-foot expansion joint. Because of the hazardous nature of the spent catalyst, the design required a primary and a secondary "waterstop," made of specialized chemical-resistant rubberized materials, to be installed within the expansion joint. Ashkar Engineering's design drawings for the expansion project and the waterstop manufacturer's specifications detailed how the waterstops were to be fastened and installed within the expansion joint. In addition to the waterstops, the design required the expansion joint to be covered with a sealant. It further required installation of a secondary containment system to hold any liquids that breached the first waterstop. The waterstops and

3

other features of the expansion joint were designed to prevent hazardous materials from leaking through the joint into the environment.

In May 2005, Gulf chose Miner Dederick, a commercial construction company, to be the general contractor for the construction of the CB2 expansion. Gulf entered into a written contract with Miner Dederick to build the CB2 expansion. Pursuant to the contract, Miner Dederick agreed to construct the expansion in accordance with Ashkar Engineering's plans and specifications.

Miner Dederick substantially completed the construction of the expansion in January 2006, and Gulf began storing spent catalyst in the CB2 expansion. In March 2006, Miner Dederick gave Gulf a document entitled "Certificate of Guaranty," providing a one-year warranty for the materials and work performed by Miner Dederick on the expansion project.

In June 2006, an adjacent property owner reported to Gulf that it had discovered an oily substance in a ditch on its property. Upon investigation, Gulf discovered that an oily substance was leaking from the expansion joint of CB2 where the new foundation met the old foundation.

On June 26, 2006, a Miner Dederick employee, Dan Shead, visited Gulf's facility. After looking at the exterior of CB2 where the expansion joint is located, Shead faxed a handwritten sketch to Miner Dederick, indicating that he saw a "leak" at the expansion joint. He noted that he observed an "oil stain," "oil

4

dripping," and an "oil puddle" at the expansion joint. Shead did not observe the joint from inside the building. Catalyst was still being stored on the expansion joint and would continue to be stored on it until early 2007.

James Milner, Ashkar Engineering's prime design consultant who had worked on the expansion project, also visited the site on June 26 and returned to the site approximately six times during the fall of 2006. From the exterior of the building, Milner saw light coming through the expansion joint. From this observation, Milner deduced that there was a hole in the expansion joint, which had to be repaired.

Gulf asked Ashkar Engineering to design a repair for the expansion joint. Once completed, the repair design required the concrete to be chiseled out on each side of the expansion joint and a new waterstop placed on either side. The design also required a new concrete slab to be poured over the expansion joint. In addition, to keep catalyst from being stored directly on the joint, as it had been, the design included a 15 foot high containment wall to be built along the expansion joint.

Gulf requested that Miner Dederick repair the expansion joint, pursuant to the warranty, using the repair designed by Ashkar Engineering. After reviewing Ashkar Engineering's proposed design for the repair, Miner Dederick's CEO, John Miner, responded to Gulf in January 2007. He stated that the work requested by

5

Gulf was not covered by Miner Dederick's warranty for the construction of the CB2 expansion. Miner explained that Miner Dederick regarded the work requested by Gulf to be an entirely new design for the expansion joint and not a repair of the joint. He also stated that Miner Dederick had complied with the original design plan and specifications for the expansion joint. Miner asserted that the oil leak had occurred because Ashkar Engineering's construction design was faulty. Miner indicated that it would not do the work unless Gulf signed a new contract with his company and paid an additional sum of money.

Gulf opened up the new project for bids from contractors. On March 2, 2007, John Miner sent Gulf a bid proposal indicating that Miner Dederick would do the additional work pursuant to Ashkar Engineering's designs for $498,000. Gulf hired another construction company, Cajun Contractors, to do the work for $398,605. Gulf notified Miner Dederick on March 6, 2007 that it had hired another contractor.

On March 8, 2007, John Miner sent Gulf an email message, stating, in relevant part:

> [W]e would appreciate the opportunity to review the work as it is ongoing so that Miner Dederick can view the as is condition and show that the work done at the joint between the slabs was done per plans and specs originally. If in the future Gulf Chemical expects us to be responsible for payment of any of this work, then at the very least our insurance folks will need to be there to review things first hand. Please let me know how this can be arranged. Thank you.

6

Miner did not receive a response to the message.  On March 14, 2007, John Miner sent a letter to Gulf.  He wrote,

> In my previous email dated Thursday, March 8, 2007, we had requested the opportunity to view any work that is to be done on the expansion joint at the CB2 facility or at least give our insurance folks the chance to review the existing work once it is uncovered and see that it was originally constructed per plans and specs. Once again, please let us know how this can be arranged; Miner Dederick needs the opportunity to review any and all findings first hand.  Thank you.

The following day, John Miner sent another email to Gulf in which he stated, "There is no reason to deny Miner Dederick access to document our work. Our documentation will not slow down the progress.  On the other hand, denying access is prejudicial against Miner Dederick because it deprives us of the opportunity to document the work conformed to the plans and specifications." Gulf responded as follows: "Unfortunately, we are not in a position and cannot afford to slow down the repairs for any purpose.  We plan on and intend to document whatever we find for future reference."

In early March 2007, Gulf retained Engineering Systems Inc. ("ESI"), a forensic engineering firm, to determine why oil was leaking through the expansion joint.  ESI first visited the site on March 7, 2007.  To permit ESI's inspection and testing of the expansion joint, Cajun Contractors removed six inches of sealant covering the primary waterstop and power washed the area.

After the sealant was removed, ESI did a visual inspection of the expansion joint and took photographs. James Milner of Ashkar Engineering also did a visual inspection. He would later testify that he saw "holes" between the waterstop and the face of the original concrete foundation. Milner stated that the waterstop should have been tightly fitted against the concrete to prevent liquids from penetrating the primary waterstop.

On March 16, 2007, ESI, Gulf, and Cajun Contractors performed a spontaneous "water test," in which they poured buckets of water down the expansion joint to see if it disappeared. They observed that the water did disappear. Milner later stated that, to him, this indicated there was a hole in the primary waterstop.

On March 21, 2007, ESI conducted another test of the expansion joint to understand how the joint was constructed. Using a hollow drill bit, made to drill through concrete, ESI drilled in three places along the expansion joint. When the drill bit was pulled out, the concrete stayed in the hollow drill bit. These core samples were eight inches in diameter and showed a cross-section of the expansion joint. ESI and a Gulf employee photographed the coring process.

Miner Dederick was not notified that ESI would be testing the expansion joint. Miner Dederick did not learn of the ESI testing until June 2007.

Cajun Contractors finished the work designed by Ashkar Engineering in June 2007. As part of that work, Cajun Contractors covered the expansion joint with a new sealant system and then poured six to eight inches of concrete over that. It also installed waterstops on either side of the expansion joint. In addition, Cajun Contractors built a 15-foot high 97-foot long retaining wall to prevent the storage of catalyst on the expansion joint.

Gulf filed suit against Miner Dederick on November 7, 2007, for breach of contract and for breach of warranty. It alleged that Miner Dederick breached the construction contract (1) by failing to construct the expansion joint in conformance with the project's design and its specifications and (2) by failing to repair the joint to make it conform to the plan design and specifications.

In support of its breach of warranty claims, Gulf asserted that Miner Dederick had issued a written guarantee that its work conformed to the plans and specifications for the project and that it would repair any defects to the completed structure. Gulf asserted that Miner Dederick refused to honor the warranty and make the necessary repairs after Gulf had notified Miner Dederick of defects in the structure.

Gulf filed an amended petition adding a negligence claim against Miner Dederick. Gulf also sued Ashkar Engineering and suppliers of component parts for the waterstop. These later added defendants settled with Gulf.[1]

Miner Dederick answered Gulf's suit. It asserted a number of affirmative defenses, including waiver, excuse, impossibility, and illegality of contract.

Miner Dederick also filed a counter-claim against Gulf for breach of contract. Miner Dederick alleged that Gulf had breached the construction contract by providing Miner Dederick with a faulty construction design for the expansion joint. Miner Dederick alleged that Gulf knew, or should have known, that the design would result in oil seepage from the expansion joint. In addition, Miner Dederick asserted claims against Gulf for various torts.

Miner Dederick further alleged that Gulf had spoliated evidence. Specifically, Miner Dederick alleged that Gulf had refused to allow it to inspect the expansion joint, had failed to notify Miner Dederick of the testing conducted on it,

---

[1] Ashkar Engineering filed a motion to dismiss Gulf's claims against it based on Gulf's failure to comply with the certificate-of-merit requirements of Civil Practice and Remedies Code section 150.002. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 150.002. The trial court denied the motion. In interlocutory appeal, we reversed the trial court's order denying the motion to dismiss Gulf's claims against Ashkar Engineering and remanded to the trial court for it to dismiss the claims. *See Ashkar Eng'g Corp. Gulf Chem. & Metallurgical Corp.*, No. 01-09-00855-CV, 2010 WL 376076, at *10 (Tex. App.—Houston [1st Dist.] Feb. 4, 2010, no pet.). While this Court still had plenary power, Ashkar Engineering and Gulf entered into a settlement agreement. The parties filed a joint motion to dismiss the appeal, which we granted. *See Ashkar Eng'g Corp. Gulf Chem. & Metallurgical Corp.*, No. 01-09-00855-CV, 2010 WL 1509287, at *1 (Tex. App.—Houston [1st Dist.] Apr. 15, 2010, no pet.).

10

and had effectively destroyed the expansion joint by covering it with concrete. Miner Dederick asserted that Gulf had a duty to inform Miner Dederick of the testing conducted on the expansion joint and to preserve it for Miner Dederick's inspection and testing. Miner Dederick claimed that Gulf's actions with respect to the expansion joint had prejudiced Miner Dederick's ability to defend against Gulf's claims. Miner Dederick requested the trial court to either sanction Gulf or instruct the jury on the spoliation presumption.

Gulf filed a traditional and no-evidence motion for summary judgment on Miner Dederick's counter-claims. After Miner Dederick responded, the trial court signed an order on July 2, 2010 granting summary judgment on Miner Dederick's counter-claims.

Gulf also filed a traditional motion for partial summary judgment on its breach of contract claim against Miner Dederick; that is, Gulf asserted that, as a matter of law, Miner Dederick was liable to it for breach of the construction contract. Gulf asserted that Miner Dederick had breached the construction contract by failing to construct the expansion joint pursuant to the specifications required by Ashkar Engineering's design drawings and those contained in the manufacturer's installation guide for the waterstop. In its motion, Gulf identified four design specifications with which it alleged Miner Dederick had failed to comply in constructing the expansion joint.

11

As summary judgment evidence, Gulf offered the deposition testimony of its own witnesses and those aligned with Miner Dederick, as well as the report of ESI, the forensic engineering firm hired by Gulf to determine why the expansion joint had failed. To support non-compliance with each individual design specification, Gulf relied heavily on the deposition testimony of James Milner of Ashkar Engineering. Milner had been permitted to view the expansion joint after the catalyst and sealant had been removed from the joint. Milner had been present on the day the water test was performed while ESI was at the site. Milner's cited deposition testimony regarding non-compliance was based, to a great extent, on ESI's photographs of the expansion joint, including a photograph of a core sample taken by ESI, and on ESI's report.

In its response to the motion for summary judgment, Miner Dederick asserted that Gulf was not entitled to summary judgment because Gulf had engaged in spoliation by failing to preserve the expansion joint. Miner Dederick wrote,

> Gulf understood the importance of this evidence. It retained forensic engineers to investigate the construction and integrity of the expansion joint, conduct destructive testing, render opinions . . . as to the failure of the expansion joint. It selectively photographed portions of the expansion joint before it covered it with a half a foot of concrete and permanently destroyed any opportunity to investigate it, conduct testing, or even visually inspect it.

12

Miner Dederick offered the affidavit of John Miner, who testified that he had requested, "in writing, the opportunity to investigate the expansion joint prior to the work being performed so that Miner Dederick could confirm the joint was constructed as planned." Miner testified that Miner Dederick was concerned that it would be prejudiced if it were not allowed to investigate because Gulf had stated that it may seek damages from Miner Dederick. Attached to Miner's affidavit were the emails sent by Miner to Gulf, in early March 2007, requesting permission to inspect the expansion joint before it was repaired and Gulf's response to Miner denying the request.

Miner stated that Gulf's investigation and testing of the expansion joint in March 2007 occurred without any notice to Miner Dederick. He testified that it was in June 2007 that Miner Dederick first learned that Gulf had performed "the destructive forensic testing" on the expansion joint in March 2007. Miner explained that the results of the testing and investigation were first disclosed to Miner Dederick when Gulf's representative came to Miner Dederick's offices in June 2007 seeking $10,000,000 in damages.

Miner Dederick also asserted in its response that Gulf's conduct with respect to the expansion joint "severely prejudiced" its ability to present a defense. Miner Dederick claimed "[t]he testing and repairs Gulf performed on the expansion joint either destroyed or forever concealed evidence of the alleged construction defects

in the expansion joint, depriving Miner Dederick of any opportunity to investigate and conduct its own testing." Miner Dederick offered the affidavit of its engineering expert, Randall Rosengarten, who testified that he would have performed five additional tests at the site if he had been given the opportunity. Miner Dederick asserted that Gulf's conduct deprived it of the ability to show that it had constructed the expansion joint according to the plans and specifications and that it had not been the cause of injury to Gulf.

Miner Dederick requested that the trial court sanction Gulf for the spoliation of the expansion joint. Specifically, Miner Dederick requested that the trial court "either strike Gulf's pleadings or preclude Gulf from introducing evidence of the construction of the expansion joint, and Gulf's inspection, investigation, and testing of the expansion joint." Alternatively, Miner Dederick asserted that it was "entitled to a rebuttable presumption that the evidence Gulf destroyed was unfavorable to Gulf on the issues of the cause of the oil leak and the existence of the construction defects . . . and that the spoliated evidence supports Miner Dederick's claims and defenses."

Gulf replied to Miner Dederick's spoliation argument. Gulf asserted that it did not breach a duty to preserve the expansion joint because Miner Dederick never requested to test the joint. Miner Dederick also averred that the expansion joint still exists, albeit buried under six inches of concrete. Gulf asserted that the

14

joint was covered with concrete in Gulf's ordinary course of business. Lastly, Gulf argued that Miner Dederick was not prejudiced because the expansion joint has always been available for Miner Dederick to perform its own testing.

On July 10, 2010, the trial court granted Gulf's motion for partial summary judgment on its affirmative claim for breach of contract. In so doing, the trial court implicitly denied Miner Dederick's request for spoliation sanctions or a spoliation presumption.

On August 3, 2010, Miner Dederick filed its "Motion for Sanctions for Spoliation of Evidence." Miner Dederick reiterated the arguments it had made in its response to Gulf's motion for partial summary judgment. Miner Dederick again requested the trial court to issue spoliation sanctions or find that Miner Dederick was entitled to a spoliation presumption. The trial court signed an order denying Miner Dederick's motion for sanctions.

The case was tried to a jury in February 2011. During trial, Miner Dederick again moved for spoliation sanctions against Gulf and for a directed verdict based on the element of causation. The trial court denied the motions.

Gulf also asked that a spoliation presumption instruction be given to the jury. The trial court denied the request. In addition, the trial court rejected Miner Dederick's proposed jury instructions on prior material breach, impossibility, and impracticability.

15

After a six day trial, the jury was asked to find whether Miner Dederick failed to comply with an express warranty in connection with its work on CB2. The jury answered in the affirmative. When asked whether Miner Dederick's failure to comply with the warranty was excused, the jury answered in the negative.

Based on its earlier summary-judgment ruling on Miner Dederick's breach of contract liability, the trial court instructed the jury, over Miner Dederick's objection, as follows:

> In a ruling issued before trial, the Court determined that Defendant Miner Dederick Construction breached its construction contract with Plaintiff Gulf by failing to comply with the plans and specifications. This is not a question for you the Jury to determine, and Gulf was not required to prove the fact of Miner Dederick's breach to you.

With respect to breach-of-contract damages, the jury was asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Gulf for its damages that resulted from Defendant Miner Dederick Construction's breach of contract?" The jury was asked a similar question with respect to breach of warranty damages. For each claim, the jury was permitted to award three types of damages: (1) remedial damages, (2) incidental damages, and (3) lost profits.

In the charge, remedial damages were defined as "[t]he reasonable and necessary costs incurred by Gulf to repair the CB2 expansion joint." The jury was instructed that incidental damages are "[t]he reasonable and necessary costs

16

incurred by Gulf for storage of spent catalyst while CB2 was being repaired which were a natural, probable, and foreseeable consequence of Miner Dederick's breach." The charge defined lost profits to be "a natural, probable, and foreseeable consequence of Miner Dederick's breach." For each claim, the jury awarded Gulf $464,688 in remedial damages, $104,330 in incidental damages, and $158,446 in lost profits. The jury also awarded Gulf attorney's fees of $907,718 for trial preparation and additional attorney's fees, totaling $65,000, for an appeal to this Court and to the Supreme Court of Texas.

Miner Dederick filed post-judgment motions, including a motion for judgment notwithstanding the verdict and a motion for new trial. The trial court denied the motions.

Based on the jury's verdict, the trial court signed a judgment awarding Gulf actual damages of $727,464.00, prejudgment of interest of $84,385.82, and costs of $14,810.01. The trial court also awarded Gulf the attorney's fees found by the jury. This appeal followed.

## Trial Court's Jurisdiction to Render Judgment Following Trial

As an initial matter, we address Miner Dederick's argument that the trial court lacked jurisdiction to sign the judgment in this case following trial. Miner Dederick asserts that the trial court's July 16, 2010 order granting summary judgment on Miner Dederick's counter-claims, when taken with the July 2, 2010

order granting Gulf's motion for partial summary judgment on its affirmative claim for breach of contract, constituted a final, appealable judgment. Miner Dederick argues that it follows that the trial court lost plenary power 30 days after signing the July 16, 2010 order. Miner Dederick asserts that, as a result, the trial court was without jurisdiction to render the March 7, 2011 judgment against Miner Dederick following trial.

Generally, a judgment is final if it disposes of all pending parties and claims in the record. *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 204 (Tex. 2001). When there has been no conventional trial on the merits, a judgment is final for purposes of appeal only if it either actually disposes of all claims and parties before the court, regardless of its language, or if it states, with unmistakable clarity, that it is a final judgment. *Id.* If other claims remain in the case, "an order determining the last claim is final." *Id.* at 200. Whether an order is a final judgment for purposes of appeal must be determined from its language and the record in the case. *Id.* at 204.

Here, Gulf's breach of warranty claim and the damages portion of its breach of contract claim remained pending after the trial court granted Gulf's motions for summary judgment. Nonetheless, Miner Dederick argues that there was a final judgment following the summary judgment rulings for two reasons: (1) the July 2, 2010 order granting summary judgment on Miner Dederick's counter-claims was

18

entitled "Order Granting Gulf's Motion for Final Summary Judgment" and (2) the order contained a Mother Hubbard clause; that is, it stated "all relief not expressly granted herein is denied."

Contrary to Miner Dederick's contentions, finality of a judgment can no longer be determined solely by the existence of a Mother Hubbard clause, particularly when a judgment is rendered without a conventional trial on the merits. *Id*. at 203–04. Nor can the status of an order be conclusively determined by its title, either "final" or "interlocutory." *Id*. at 200. The intent to finally dispose of the case must be unequivocally expressed in the words of the order itself. *Id.*

In this case, neither summary judgment order unequivocally expresses that the trial court had disposed of all claims. The record shows that, at that time the orders were signed, Gulf's breach of warranty and contract damages claims remained pending. We conclude that the trial court's orders granting Gulf's motions for summary judgment did not constitute a final judgment. Thus, we hold that the trial court had jurisdiction when it signed the March 7, 2011 final judgment following trial.

19

**Summary Judgment on Miner Dederick's Counter-Claim**

In its fourth issue, Miner Dederick includes a challenge to the trial court's grant of Gulf's summary judgment on Miner Dederick's counter-claim for breach of contract.[2]

B.     **Unchallenged Summary Judgment Ground Support Ruling**

In its summary judgment motion, Gulf asserted the following three grounds as bases to support summary judgment on Miner Dederick's breach of contract counter-claim: (1) Miner Dederick had no compensable breach of contract damages as a matter of law; (2) Miner Dederick "cannot identify any contractual provision of the [construction contract] that Gulf allegedly breached"; and (3) Miner Dederick failed to file its claim within the limitations period.  The trial court did not identify the basis on which it granted summary judgment.

In its opening brief on appeal, Miner Dederick offers arguments pertaining to the first and third grounds on which Gulf sought summary judgment.  As pointed out by Gulf, Miner Dederick does not address whether summary judgment could have been granted on the ground that Gulf did not breach a contractual obligation to Miner Dederick.

---

[2]     Miner Dederick states in its brief that it does not dispute the granting of summary judgment against it on its tort claims against Gulf. *See Jacobs v. Satterwhite*, 65 S.W.3d 653, 655 (Tex. 2001) (indicating that appellate courts should affirm a trial court's summary judgment on unchallenged claims).

When a party moves for summary judgment on multiple grounds and, as here, the trial court's order granting summary judgment does not specify the ground or grounds on which it was based, a party who appeals the order must negate all possible grounds on which the order could have been based. *See Ellis v. Precision Engine Rebuilders, Inc*., 68 S.W.3d 894, 898 (Tex. App.—Houston [1st Dist.] 2002, no pet.). To make this challenge, the appellant may either assert a separate issue challenging each possible ground or assert a general issue that the trial court erred in granting summary judgment and, within that issue, provide argument negating all possible grounds on which summary judgment could have been granted. *See Jarvis v. Rocanville Corp*., 298 S.W.3d 305, 313 (Tex. App.— Dallas 2009, pet. denied); *see also McCoy v.* Rogers, 240 S.W.3d 267, 272 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). If an appellant does not challenge each possible ground for summary judgment, we must uphold the summary judgment on the unchallenged ground. *See Ellis*, 68 S.W.3d at 898; *see also McCoy*, 240 S.W.3d at 272–73. Accordingly, we must affirm the summary judgment on Miner Dederick's breach of contract counter-claim. [3] *See Ellis*, 68 S.W.3d at 898; *see also McCoy*, 240 S.W.3d at 272–73.

---

[3] In its reply brief, Miner Dederick offers argument addressing Gulf's assertion that it was entitled to summary judgment because it did not breach a contractual obligation to Miner Dederick. However, the rules of appellate procedure do not allow an appellant to include in a reply brief a new issue in response to some matter pointed out in the appellee's brief but not raised in the appellant's opening

21

## B. No Evidence of Breach-of-Contract Damages

Even assuming that Miner Dederick successfully presented argument to show that Gulf breached a contractual obligation, summary judgment on Miner Dederick's breach-of-contract counter-claim was nonetheless appropriate. Gulf presented a combined traditional and no-evidence motion for summary judgment. The trial court granted the motion without identifying the basis for its ruling.

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The standards of review for traditional and no-evidence summary judgments are well known. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). With respect to a traditional motion for summary judgment, the movant has the burden to demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49. In contrast, to defeat a no-evidence summary judgment, the nonmovant is required to produce evidence that raises a genuine issue of material fact on each challenged element of its claim. *Gish*, 286 S.W.3d at 310; *see also* TEX. R. CIV. P. 166a(i).

---

brief. *See* TEX. R. APP. P. 38.3; *Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex. App.—Austin 2004, pet. denied); *see also Barrios v. State*, 27 S.W.3d 313, 322 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ("Pointing out the *absence* of an appellant's argument does not raise the argument or entitle appellant to assert that argument for the first time in his reply brief.").

Among its grounds, Gulf asserted summary judgment was proper because Miner Dederick had no compensable damages as a matter of law. Damages are an essential element of a breach of contract claim. *See Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.3d 197, 202 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (listing "damages sustained as a result of the breach" as an element of a breach-of-contract claim). Gulf pointed out that the only damages sought by Miner Dederick were its expenses for defending against Gulf's claims. Miner Dederick responded by offering a document, Exhibit 26, created to show the value of the time spent by its employees and executives to investigate and to respond to Gulf's claims.

In its brief, Miner Dederick asserts that it produced evidence of damages. Miner Dederick points to Exhibit 26 attached to its summary judgment response. Exhibit 26, created during litigation, is an itemized statement of tasks performed by several of Miner Dederick employees and executives. It lists the name of the Miner Dederick employee or executive, the task completed by that person, the time spent on the task, the hourly rate for that individual, and the total sum of money attributed to each task.

In its summary judgment response, Miner Dederick explained that these are tasks related to responding to and investigating Gulf's claim against it. These tasks included site visits, document review, and preparing a re-design of the expansion

23

joint. However, there is no evidence that Miner Dederick paid, or was obligated to pay, the sums reflected in the document beyond the salary or compensation that Miner Dederick already paid to each listed individual. In other words, the document does not reflect that any of the sums listed are an actual measure of loss sustained by Miner Dederick as a result of the alleged breach of the contract by Gulf. *See RAJ Partners, Ltd. v. Darco Const. Corp.*, 217 S.W.3d 638, 649 (Tex. App.—Amarillo 2006, no pet.) (holding that company was not entitled to damages for time spent by its executives to address breach of contract dispute, noting that evidence did not show that company was obligated to pay sum requested or that the sum reflected an actual measure of loss to the company); *see also Nw. Otolaryngology Assoc. v. Mobilease, Inc.*, 786 S.W.2d 399, 405 (Tex. App.— Texarkana 1990, writ denied) (holding, in a breach of contract case, that partnership—which was the defendant/counter-plaintiff—was not entitled to compensation for time spent by partners in investigation and depositions).

We conclude that Miner Dederick did not raise a genuine issue of material fact with regard to the element of damages for its breach of contract counter-claim. *See* TEX. R. CIV. P. 166a(i). The trial court did not err when it granted summary judgment in favor of Gulf on Miner Dederick's breach of contract claim.

We overrule Miner Dederick's fourth issue to the extent that it challenges the trial court's summary judgment on its breach of contract counter-claim.

24

## Spoliation of Evidence

In its third issue, Miner Dederick asserts that the trial court abused its discretion by failing to assess spoliation sanctions against Gulf with respect to its failure to preserve the expansion joint for Miner Dederick's viewing, inspection, and testing.[4]

### A.     Standard of Review

We review a trial court's order denying a motion for spoliation sanctions under an abuse of discretion standard. *See Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003); *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 199 (Tex. App.—Austin 2005, pet. denied); *see also Clark v. Randalls Food*, 317 S.W.3d 351, 356 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A trial court commits an abuse of discretion only if its decision is arbitrary, unreasonable, and without reference to guiding principles. *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996). An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence. *In re Barber*, 982 S.W.2d

---

[4]     Gulf asserts in its brief that Miner Dederick did not request spoliation sanctions before the trial court granted partial summary judgment in this case on Gulf's breach of contract claim. This is incorrect. Miner Dederick asserted its request for spoliation sanctions in its response to Gulf's motion for partial summary judgment. When a summary judgment non-movant requests a spoliation determination in its response to a motion for summary judgment, the trial court implicitly makes a finding of no spoliation by granting the motion for summary judgment. *See Clark v. Randalls Food*, 317 S.W.3d 351, 356 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *Adobe Land Corp. v. Griffin, L.L.C.*, 236 S.W.3d 351, 356–57 (Tex. App.—Fort Worth 2007, pet. denied)).

364, 366 (Tex. 1998). Nevertheless, a trial court has no discretion in determining what the law is or in applying the law to the facts. *Clark*, 317 S.W.3d at 356.

## B. Law of Spoliation

The inquiry regarding whether a spoliation sanction or presumption is justified requires a court to consider (1) whether there was a duty to preserve evidence, (2) whether the alleged spoliator breached that duty; and (3) whether the spoliation prejudiced the non-spoliator's ability to present its case or defense. *Clark*, 317 S.W.3d at 356 (citing *Adobe Land Corp. v. Griffin, L.L.C.*, 236 S.W.3d 351, 356–57 (Tex. App.—Fort Worth 2007, pet. denied)); *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 666 (Tex. App.—Houston [1st Dist.] 1998, no pet.)). With these principles in mind, we determine whether the trial court abused its discretion by denying Miner Dederick's request for spoliation sanctions or a spoliation presumption.

## C. Analysis

### 1. Duty to Preserve Evidence

The duty to preserve evidence is not raised unless (1) a party knows or reasonably should know that there is a substantial chance a claim will be filed, and (2) evidence is relevant and material. *Clark*, 317 S.W.3d at 356–57 (citing *Johnson*, 106 S.W.3d at 722).

A party knows or reasonably should know that there is a substantial chance a claim will be filed if a reasonable person would conclude from the severity of the incident, and other circumstances surrounding it, that there was a substantial chance for litigation at the time of the alleged spoliation. *See Tex. Elec. Coop. v. Dillard*, 171 S.W.3d 201, 209 (Tex. App.—Tyler 2005, no pet.) (citing *Johnson*, 106 S.W.3d at 722). "A party should not be able to subvert the discovery process and the fair administration of justice simply by destroying evidence before a claim is actually filed." *See Trevino*, 969 S.W.2d 950, 955 (Tex. 1998) (Baker, J., concurring).

Here, the evidence shows that, prior to taking the core samples from the expansion joint and then covering it with concrete, Gulf requested Miner Dederick to repair the expansion joint under the warranty. Miner Dederick responded by stating to Gulf that the leaks were not caused by defective construction but rather by a flaw in the design of the joint. Miner Dederick also indicated to Gulf that the repair work requested was not covered by the warranty because it was based on a completely new design for the expansion joint. Additionally, Gulf's act of retaining ESI, a forensic engineering company, to conduct the core testing on the expansion joint before the joint was covered with concrete also indicates that Gulf knew there was a substantial chance that it would be filing a claim against Miner Dederick.

27

The evidence at trial also indicated that Gulf denied Miner's request to inspect the expansion joint on the advice of its attorneys. In support of its attorney's fees request, Gulf offered the testimony of its counsel. On cross-examination, the following exchange occurred:

Q. Are you aware that the response to Miner Dederick's request for inspection [on] March 8, 2007, was to deny that request?

A. Yes, I am.

Q. And that denial of that request was done with the input of your law firm, and your law firm is purporting to request fees from this jury for the time you spent to deny that request, correct?

A. I think that that's a fair assessment, yes.

The involvement of counsel indicates that Gulf was aware there was a substantial chance of litigation at the time of the spoliation. In short, the record evidence shows that, at the time of the alleged spoliation, there was a substantial chance Gulf would file a claim against Miner Dederick. *See Johnson*, 106 S.W.3d at 722.

To show that the evidence is relevant and material, a party must demonstrate that the alleged spoliator knew or should have reasonably known that the evidence would be relevant to the action. *See Clark*, 317 S.W.3d at 357 (citing *Johnson*, 106 S.W.3d at 722). A party must preserve what it knows, or reasonably should know, is relevant in the action or is reasonably calculated to lead to the discovery of admissible evidence. *See id.* (citing *Trevino*, 969 S.W.2d at 957 (Baker, J.,

concurring)). Here, the expansion joint is the subject matter of the claims. It is undisputed that it is relevant to the litigation.

In sum, Gulf had a duty to preserve the expansion joint. Given the evidence, it would have been unreasonable for the trial court to have concluded otherwise.

## 2. Breach of Duty to Preserve

Although it need not take extraordinary measures to preserve evidence, a party has a duty to exercise reasonable care in preserving potentially relevant evidence. *See id.* (citing *Trevino*, 969 S.W.2d at 957 (Baker, J., concurring)). A spoliator can defend against an assertion of negligent or intentional destruction by providing explanations to justify its failure to preserve evidence. *Id.* Here, Gulf defends against the spoliation complaint by asserting that the repair of the expansion joint was in the ordinary course of its business. Such a justification has been successful in some cases, but it is not successful in this case. *Cf. Aguirre v. S. Tex. Blood & Tissue Ctr.*, 2 S.W.3d 454, 457 (Tex. App.—San Antonio 1999, pet. denied) (holding destruction of records in the regular course of business and without notice of their relevance to future litigation did not raise spoliation presumption).

A claim that the evidence was destroyed in the ordinary course of business will not excuse the obligation to preserve when a party's duty to preserve evidence arises before the destruction. *See Adobe Land Corp.*, 236 S.W.3d at 359. As

29

discussed *supra*, the evidence shows that Gulf's duty to preserve arose before it conducted the repair. Therefore, Gulf's failure to preserve cannot be justified on the basis that the evidence was destroyed in the ordinary course of business. *See id.*

In its brief, Gulf also asserts that it "did not breach any duty to preserve evidence because the defective expansion joint remains in place (but repaired) and available to be tested." We disagree with this assertion.

As mentioned, a party that has a duty to preserve evidence has a duty to exercise reasonable care in preserving it. *See Clark*, 317 S.W.3d at 357 (citing *Trevino*, 969 S.W.2d at 957 (Baker, J., concurring)). Implicit in the duty to exercise reasonable care in preserving evidence is the duty to refrain from altering or changing the evidence's condition or integrity. Illustrating this precept is, for example, Texas case authority explaining that a spoliation instruction is an instruction given to the jury outlining permissible inferences it may make against a party who has lost, *altered*, or destroyed evidence. *See Dillard*, 171 S.W.3d at 208; *Brewer v. Dowling*, 862 S.W.2d 156, 159 (Tex. App.—Fort Worth 1993, writ denied).

Black's Law Dictionary defines spoliation as the "intentional destruction or alteration of evidence, or the knowing failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." BLACK'S LAW

DICTIONARY 1409 (7th ed. 1999). Courts in other jurisdictions have adopted a definition of spoliation that expressly includes the act of altering evidence. *See, e.g., Kearney v. Foley & Lardner*, *LLP*, 590 F.3d 638, 649 (9th Cir. 2009); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Pyeritz v. Commonwealth of Pa.*, 32 A.3d 687, 692 (Pa. 2011); *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000).

In this case, Ashkar Engineering's design drawings for the repair project required Cajun Contractors to "remove [from the existing joint] sufficient concrete, joint sealant, joint filler and other materials to determine the cause of the failure of the existing joint." The undisputed evidence shows that, under Gulf's direction, Cajun Contractors removed approximately six inches of sealant—which had been installed by Miner Dederick—before testing was conducted on the joint. Once the sealant was removed, the joint was no longer in the same condition that it was when Miner Dederick finished the construction project. At that point, the expansion joint was missing one of the components that Miner Dederick had been instructed to install. In other words, the joint was permanently altered even before testing began.

As part of the testing, three eight-inch-diameter core samples were then drilled from the expansion joint. Gulf directed Cajun Contractors to cut the concrete along each side of the expansion joint and to install a new waterstop on

31

either side.  Next, Cajun Contractors, pursuant to Gulf's instruction, poured a new six to eight inch concrete slab over the 140 foot long expansion joint.

Based on this undisputed evidence, it would not have been reasonable or rational for the trial court to have concluded that Gulf exercised reasonable care in preserving the expansion joint for the foreseeable litigation.  To the contrary, Gulf intentionally altered the condition and the integrity of the expansion joint without affording Miner Dederick the opportunity to inspect it.  Gulf's insinuation that the expansion joint was preserved under the concrete is not supported by the record.

Gulf also asserts that it did not breach its duty to preserve the evidence because Miner Dederick never requested to conduct its own tests on the expansion joint.  Gulf further contends that Miner Dederick has waived its right to complain of spoliation because, after suit was filed, Miner Dederick did not serve Gulf with a discovery request to inspect or to test the joint nor did Miner Dederick seek a motion to compel such discovery from the trial court.  In making such argument, Gulf misses the mark.

Significantly, Miner Dederick, through its CEO, John Miner, requested to inspect the expansion joint in three separate correspondences.  Miner indicated that it needed to determine whether its work had conformed to the plans and specifications.  The requests were made before Cajun Contractors began construction and before the performance of the water test and the core sampling on

the joint. Gulf expressly refused to allow Miner Dederick to inspect the expansion joint. This was in March 2007.

John Miner's affidavit indicated the reason why Miner Dederick did not request to inspect the expansion joint before the time it made its first request. According to Miner, until the time of his requests to inspect the expansion joint, Miner Dederick was under the impression that it would be doing the new construction work to remedy the leaking joint. Miner testified also that, until that time, the expansion joint could not be viewed because it was covered with catalyst. In other words, Miner thought his company would able to inspect the joint at the time it completed the repairs.

Miner stated that, once Miner Dederick learned that another contractor would be doing the work, it "requested, in writing, the opportunity to investigate the expansion joint prior to work being performed so that Miner Dederick could confirm the joint was constructed as planned." He continued, "Miner Dederick knew that Gulf would have to move the catalyst from the joint to perform the work, and Miner Dederick wanted to investigate."

The evidence showed that John Miner made his last request to inspect the expansion joint on March 15, 2007. The request was denied. Gulf did not notify Miner Dederick of the testing. The water test was conducted one day later on March 16, and the core samples were taken less than a week later on March 21.

33

Cajun Contractor then began its work on the expansion joint, which was completed in June 2007. It was also in June 2007 that Miner Dederick first learned of the testing that Gulf had performed on the expansion joint.

By the time litigation was filed in November 2007, the expansion joint had already been altered from its original condition. The opportunity to inspect and to test the expansion joint in its unaltered condition was gone. Miner Dederick's lack of a discovery request to test the expansion joint did not waive its spoliation complaint and does not absolve Gulf from its failure to preserve the evidence at a time that litigation was foreseeable.[5] We conclude that it would not have been

---

[5] Miner Dederick clarifies it is not suggesting that Gulf had an indefinite duty to preserve the expansion joint in its original condition or to forestall repairs without limitation. Instead, Miner Dederick states that it should have been notified of the testing by Gulf and given the opportunity to attend the testing. Miner Dederick also contends that it should have been given the opportunity to inspect the premises before Cajun Contractors performed its work on the expansion joint. It follows that, had it been given the opportunity to inspect the expansion joint and attend Gulf's testing, Miner Dederick may have determined that it did not need to conduct its own testing. We note that courts in other jurisdictions have recognized that a custodial party, who has a legitimate need to destroy the evidence, may discharge its duty to preserve evidence by giving its opponent notice of the claim and a full and fair opportunity to inspect the evidence before its destruction. *See Miller v. Lankow*, 801 N.W.2d 120, 128–29 (Minn. 2011); *Am. Family Mut. Ins. Co. v. Golke*, 768 N.W.2d 729, 737–38 (Wis. 2009) (citing *N. Assurance Co. v. Ware*, 145 F.R.D. 281, 284 (D. Me. 1993) (holding that "reasonable notice to likely adversaries" that the evidence was to be destroyed would be sufficient to prevent a sanction for spoliation); *Cooper v. United Vaccines, Inc.*, 117 F. Supp. 2d 864, 875 (E.D. Wis. 2000) (stating that claim might not have been dismissed if plaintiff had notified defendant of its intention to engage in destructive testing of evidence so that defendant could have participated or conducted its own testing); *Howell v. Maytag*, 168 F.R.D. 502, 506 (M.D. Pa. 1996) (explaining that "plaintiffs could reasonably have given [the defendant]

reasonable for the trial court to have concluded that Gulf did not breach its duty to preserve the evidence.

### 3.    Prejudice

The last step of our analysis focuses on whether Gulf's spoliation prejudiced Miner Dederick's ability to present its defense against Gulf's claims. *See Adobe Land Corp.*, 236 S.W.3d at 359. In making this determination, we look to a variety of circumstances such as (1) the relevancy of the missing evidence and (2) the availability of other evidence to take the place of the missing information. *Id.* (citing *Trevino*, 969 S.W.2d at 958 (Baker, J., concurring)).

As Miner Dederick correctly points out, the expansion joint was the most important piece of evidence in the case. Gulf's primary evidence offered in support of its motion for partial summary judgment on its affirmative claim for breach of contract were James Milner's testimony of his personal observations of

---

notice of the potential claim, and provided it with an opportunity to conduct an independent investigation before the demolition of the fire scene"); *Baliotis v. McNeil*, 870 F. Supp. 1285, 1290–91 (M.D. Pa. 1994) (stating that relevant evidence should not be destroyed without giving the other party an opportunity for inspection); *Hirsch v. Gen. Motors Corp.*, 266 N.J. Super. 222, 251, 628 A.2d 1108, 1122 (Law Div. 1993) (holding that a "potential spoliator need do only what is reasonable under the circumstances," which included allowing defendants a reasonable amount of time to inspect the evidence and giving notice of probable litigation (citation omitted)); *cf. Hamilton Mut. Ins. Co. of Cincinnati v. Ford Motor Co.*, 702 N.E.2d 491, 493 (Ohio Ct. App. 1997) (holding that exclusion of expert testimony as sanction for spoliation was improper because defendant had been given multiple notices and opportunities to inspect the evidence and had indicated that it would not do so)).

the expansion joint and ESI's report and photographs taken during its forensic investigation and testing.

In contrast, Miner Dederick was denied the opportunity to inspect the expansion joint or to be present at the forensic testing. Although Gulf asserts that it would have allowed Miner Dederick to conduct testing, had it asked, this assertion is belied by the undisputed evidence that it refused to allow Miner Dederick to inspect the expansion joint before Cajun Contractors began work. Once the work began, the condition of the expansion joint was altered. Even assuming Gulf would have allowed Miner Dederick to conduct testing at that point, it would have been under different conditions than those under which ESI conducted its inspection and testing.

By altering the condition of the expansion joint, Gulf deprived Miner Dederick of the opportunity to gather evidence to rebut the evidence offered by Gulf in support of its claims and to develop its affirmative defenses. Specifically, Miner Dederick could not counter the testimony of James Milner, who described his personal observations of the expansion joint, with its own witness testimony regarding the condition of the expansion joint. Miner Dederick could not refute similar observations made in ESI's report or take its own photographs of the expansion joint or of the testing. In short, Miner Dederick was deprived of the

36

ability to determine whether it could show that it had complied with the design plans and specifications.

Nor could Miner Dederick fully develop its defensive theory that it did not cause injury to Gulf. Miner Dederick could not fully critique ESI's methodology or easily refute the testing. Additionally, Miner Dederick offered the affidavit testimony of its engineering expert, who identified additional tests that he would have conducted.

With respect to availability of other evidence to take the place of the missing information, the record shows that ESI and a Gulf employee took photographs of the expansion joint and the testing. In addition, videotape was taken of some of the testing processes. The three core samples were also made available for Miner Dederick's inspection.

Regardless of the value of the photographic evidence, none of this evidence permitted Miner Dederick to conduct its own forensic testing on the expansion joint as it existed in its pre-repair condition. In other words, there was no available substitute for the expansion joint itself with respect to testing. Significantly, Miner Dederick's engineering expert, Randall Rosengarten, testified in his affidavit that, when he inspected them at ESI's offices, the three core samples were in a deteriorated condition and could not be reconstructed to their original condition.

He stated that the concrete in the cores had been broken and "parts of cores were incomplete with some parts of single cores in multiple boxes."

Given the record, it would not have been reasonable or rational for the trial court to have concluded that Miner Dederick was not prejudiced by Gulf's spoliation of the expansion joint. We hold that the trial court abused its discretion when it denied Miner Dederick's request to grant spoliation sanctions against Gulf.

Concomitantly, we also hold that the trial court erred when it granted partial summary judgment on Gulf's breach of contract claim against Miner Dederick. *See Clark*, 317 S.W.3d at 356 (citing *Adobe Land*, 236 S.W.3d at 360–61) ("If the trial court did abuse its discretion by denying the spoliation finding, then summary judgment would be improper."). We further hold that the trial court's error in failing to grant Miner Dederick's request for spoliation sanctions was harmful error because the error complained of probably prevented Miner Dederick from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1(a)(2).

We refrain from determining what the appropriate measure is to remedy the spoliation in this case. Rather, that is matter best left to the trial court's discretion. As recognized by the Supreme Court of Texas, trial courts "have broad discretion to take measures ranging from a jury instruction on the spoliation presumption to, in the most egregious case, death penalty sanctions." *Trevino*, 969 S.W.2d at 953. A trial court may also choose to exclude testimony or other evidence. *Trevino*, 969

S.W.2d at 959 (Baker, J., concurring). "As with any discovery abuse or evidentiary issue, there is no one remedy that is appropriate for every incidence of spoliation; the trial court must respond appropriately based upon the particular facts of each individual case." *Trevino*, 969 S.W.2d at 953.

We sustain Miner Dederick's third issue.

## Rendition vs. Remand

In issues one and two, Miner Dederick contends that the evidence was legally insufficient to support the actual damages awarded by the jury. We recognize that the legal sufficiency challenges raised by Miner Dederick in these issues, if successful, result in rendition. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992) (explaining that, as general rule, "when we sustain a no evidence point of error after a trial on the merits, we render judgment on that point."). We do not separately address issues one and two, however.

Appellate courts have broad discretion to remand for a new trial in the interest of justice. *See* TEX. R. APP. P. 43.3(b); *Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 822 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Gulf offered evidence that Miner Dederick's work failed to comply with the design plan and specifications for the expansion joint. This was shown through James Milner of Ashkar Engineering, the ESI report, and Miner Dederick's construction expert. The evidence showed that the expansion joint was defective and needed

39

repair. Similarly, Gulf presented some evidence linking the need for the repair to Miner Dederick's failure to follow the design plan and specifications. For example, Gulf presented evidence that there were holes and gaps in the expansion joint. Given the purpose of the expansion joint, the jury could have reasonably inferred that it needed repair. Gulf also presented some evidence that the work completed by Cajun Contractors to repair the joint was reasonable and necessary. For example, James Milner explained in a clear manner why the work was the most efficacious and cost-effective repair that could be made to the expansion joint. In other words, Gulf presented some evidence that it was entitled to recover, at a minimum, remedial damages from Miner Dederick.

As discussed, Miner Dederick was hampered in its ability to defend against Gulf's claims due to Gulf's spoliation of evidence. It is difficult, at this point, to conduct a meaningful review of the evidence. Had Miner Dederick been permitted to inspect the premises it may have found conclusive evidence, which the jury could not ignore, negating an element of Gulf's claim. *See City of Keller v. Wilson*, 168 S.W.3d 802, 815–17 (Tex. 2005) (explaining that conclusive evidence cannot be disregarded). Moreover, the entire presentation of the case was affected by the trial court's error in failing to remedy Gulf's spoliation. It is not surprising, then, that Gulf's evidence supports its claims. Nonetheless, the strength of the evidence supporting Gulf's recovery in this case also cannot be ignored. For these

reasons, we conclude that it serves the interest of justice for this case to be remanded to the trial court to permit it, in its broad discretion, to fashion an appropriate spoliation remedy and to conduct further proceedings, as necessary.[6] *See* TEX. R. APP. P. 43.3(b).

## Conclusion

We affirm the portion of the trial court's judgment granting summary judgment to Gulf on Miner Dederick's counter-claims against Gulf. We reverse the remaining portions of the trial court's judgment. We remand the case for further proceedings.

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

---

[6]      We need not address Miner Dederick's remaining issues.