NUMBER 13-18-00563-CV

 COURT OF APPEALS

 THIRTEENTH DISTRICT OF TEXAS

 CORPUS CHRISTI - EDINBURG

ARMANDO O’CAÑA, Appellant,

 v.

NORBERTO ‘BETO’ SALINAS, Appellee.

 On appeal from the 93rd District Court
 of Hidalgo County, Texas.

 MEMORANDUM OPINION
Before Chief Justice Contreras and Justices Benavides and Hinojosa
 Memorandum Opinion by Chief Justice Contreras

 This appeal concerns the June 9, 2018 run-off election for mayor of Mission, Texas

between appellant Armando O’Caña and appellee Norberto ‘Beto’ Salinas. O’Caña won

the election but Salinas filed a contest suit. See TEX. ELEC. CODE ANN. § 221.003 (West,

Westlaw through 2017 1st C.S.). After a bench trial, the trial court found that the true
outcome of the election could not be determined and it rendered judgment voiding the

election results.

 On appeal, O’Caña contends: (1) Salinas “failed to prove” that the number of illegal

votes was equal to or greater than the number of necessary votes to change the election

outcome; (2) the trial court abused its discretion by allowing the testimony of Salinas’s

expert witness, George Korbel; (3) Salinas submitted no evidence of the results of the

“final canvass” of the election; (4) the trial court abused its discretion by admitting certain

evidence over O’Caña’s objections; and (5) the trial court abused its discretion when it

made an adverse inference against O’Caña based upon spoliation of evidence.

 We conclude that the trial court’s spoliation inference was erroneous and the

remaining evidence was legally insufficient to support the trial court’s finding that the

number of illegal votes exceeded O’Caña’s margin of victory. Therefore, we will reverse

and render.

 I. BACKGROUND

 In the mayoral general election on May 5, 2018, Salinas received more than 49.9

percent of the vote, coming three votes shy of an outright majority, while O’Caña received

around 41.6 percent, thereby forcing a run-off.1 Unofficial results of the June 9 run-off

election showed that O’Caña defeated Salinas by 3,475 votes to 3,318, a margin of 157.

In his contest suit, filed on July 18, Salinas argued that at least 158 illegal votes were

counted for O’Caña in the run-off. See id. § 221.003(a)(1). In particular, the petition

alleged that at least 158 O’Caña voters were either (1) illegally assisted in casting their

mail-in ballots (so-called “ballot harvesting”), or (2) “bribed” to cast votes for O’Caña. See

 1 The remaining general election votes went to Jaime Gutierrez.

 2
id. § 86.010 (West, Westlaw through 2017 1st C.S.); TEX. PENAL CODE ANN. § 36.02(a)(1)

(West, Westlaw through 2017 1st C.S.).

 Trial took place between September 24 and October 5, 2018, during which 33

witnesses testified, many of whom were elderly voters speaking through a translator. Five

witnesses testified directly that they were given money in exchange for their votes in the

mayoral run-off election. These witnesses stated that they were given money by specific

people with connections to the O’Caña campaign, including O’Caña’s sister-in-law Lupita

O’Caña. Salinas’s expert witness, George Korbel, testified that, according to his

examination of voting records, 48 early voters cast their ballots around the same time as

the five voters who testified they were paid, and those 48 were assisted by the same

people as the five paid voters.2 Korbel opined that it was “very likely” that all 48 voters

were paid because “if you pay one . . . you’re going to pay everybody and that’s the way

the world works.”

 Fourteen other witnesses testified that their mail-in ballots, as well as the mail-in

ballots of four other people, were picked up and deposited in the mail by individuals

associated with the O’Caña campaign. Evidence showed that none of the carrier

envelopes for the allegedly illegally harvested ballots contained the signature of an

assistant.

 Korbel testified that there were 27 ballots known to have been illegally harvested,

 2 O’Caña filed a pre-trial motion to exclude Korbel’s testimony pursuant to the Daubert/Robinson
standard for expert testimony. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) (holding
that when the subject of expert testimony is scientific knowledge, the basis of the testimony must be
grounded in accepted scientific methods and procedures); E.I. du Pont de Nemours & Co. v. Robinson, 923
S.W.2d 549, 557 (Tex.1995) (“Scientific evidence which is not grounded in the methods and procedures of
science is no more than subjective belief or unsupported speculation.”). After a hearing, the trial court
denied the motion and admitted Korbel’s testimony.

 3
and the carrier envelopes for each of those ballots had a stamp depicting a folded United

States flag which appeared to come from a $50 roll of stamps.3 He noted that a total of

322 mail-in ballot carrier envelopes contained the same specific type of stamp, only 19 of

which contained an assistant’s signature. Korbel further noted that over 90% of the

folded-flag stamps received in the run-off election appeared to come from a roll—whereas

only 65.8% of those stamps received in the general election appeared to come from a

roll. He opined, therefore, that “[a]s many as 303” mail-in ballots may have been illegally

harvested for the run-off election.

 Two witnesses testified that they saw an O’Caña campaign worker, Esmeralda

Lara, carrying a “big” bag of ballots. One of the witnesses, Carmen Ochoa, estimated

that Lara was carrying around 200 ballots, although Ochoa previously estimated that Lara

was carrying only twenty to forty ballots. Lara herself testified that she worked for the

O’Caña campaign for the general election but secretly switched to work for the Salinas

campaign for the run-off.

 In his testimony, O’Caña denied that he and his team were involved in “a

systematic and flagrant scheme to cast illegal votes.” However, he conceded that his

campaign made over $25,000 in expenditures to VO Consulting Services, a political

consulting firm recently established by O’Caña’s niece Veronica—but he did not have any

documentation showing how the firm spent the funds. O’Caña also conceded that he had

 3 Korbel testified, over O’Caña’s objection, that this type of stamp is available from the post office
in either a book of twenty, which costs $10, or a roll of one hundred, which costs $50. He stated that the
stamps that come in a roll have perforations only on the left and right sides, whereas the stamps that come
in a book have perforations on the top or bottom or both in addition to the sides. The folded-flag stamps
he observed on the carrier envelopes for voters who alleged harvesting activities had perforations only on
the left and right sides. Korbel stated he works part time representing very poor and disabled people and
he testified, over objection, that “no poor person would buy a roll of stamps for $50.”

 4
erased some text messages from his phone “[b]efore, during, and after” the election

contest suit had already been filed, including some from Veronica, Lupita, and Lara. He

explained that it was his “standard practice” to delete text messages and emails.

 Nelida Solis, a process server, stated that she attempted on ten or twelve different

occasions to serve subpoenas on Lupita and Veronica to appear at trial. Solis agreed

that Salinas’s attorneys advised her not to attempt to serve Lupita and Veronica during a

funeral of an O’Caña family member which they both attended.

 The trial court found that more than 158 illegal votes were counted and, thus, the

true outcome of the election could not be ascertained. On November 6, 2018, the trial

court rendered judgment declaring the results of the election void and directing the

Mission city council to order a new mayoral election to take place within sixty days. The

trial court also made findings of fact and conclusions of law, including the following:

 29. The O’Caña campaign engaged in an orchestrated conspiracy to
 pursue illegal votes through bribing voters and harvesting mail-in ballots.

 ....

 30. . . . Dr. O’Caña admitted that he had no receipts, expenditure reports,
 or any other record or document that would evidence the work that VO
 Consulting Services performed for his campaign.

 31. Dr. O’Caña also admitted he deleted his records before, during, and
 after this lawsuit was filed, including his communications with VO Consulting
 Services. . . . The owner of VO Consulting, Veronica O’Caña, could not be
 subpoen[a]ed to testify at trial or via deposition, although 12 or more
 attempts were made.

 ....

 36. . . . The Court finds that at least 48 voters were bribed to vote for Dr.
 Armando O’Caña during the June run-off election, but many more voters
 were likely bribed.

 ....

 5
 39. The O’Caña campaign systematically violated the Texas Election Code
 by taking mail-in ballots from voters and depositing them in the mail, without
 signing the form on the back side of the carrier envelope to indicate
 assistance was rendered, making the ballots and votes illegal.

 ....

 54. Mr. Korbel testified that based on his review of the testimony, the
 affidavits, election materials, and the testimony at trial, at least 27 voters
 had their votes harvested by members of the O’Caña campaign. Mr. Korbel
 testified that the range of harvested voters was likely 27–303 voters.

 ....

 55. I find clear and convincing evidence that the number of illegally handled
 mail in ballots by members of the O’Caña campaign is in excess of 150
 although it is impossible to know the exact number.

 56. The final canvass reflected a margin of 157 votes between the victor,
 Dr. Armando O’Caña, and the incumbent Mayor, Norberto “Beto” Salinas.

 ....

 61. The precise number of illegal votes cast for Armando O’Caña for mayor
 in the run[-]off election of June 9, 2018, cannot be ascertained but it is in
 excess of 158 votes.

 62. In addition to the facts found, the court engages in an adverse inference
 against the contestee, Dr. Armando O’Caña, because of his destruction of
 presumptively adverse evidence in his control, akin to spoliation. He has a
 duty to preserve evidence when he knows, or reasonably should know, that
 [(a)] there is a substantial chance that a claim will be filed, and (b) that
 evidence in its possession or control will be potentially relevant to that claim.
 The Court finds Dr. O’Caña and/or his agents intentionally destroyed the
 correspondence between Dr. O’Caña and his campaign workers in order to
 conceal relevant evidence. The Court presumes this destroyed evidence
 supports a finding that at least 158 votes were illegally cast.

 O’Caña perfected this appeal, thereby automatically suspending execution of the

trial court’s judgment. See TEX. ELEC. CODE ANN. § 232.016 (West, Westlaw through 2017

1st C.S.). We ordered the appeal accelerated pursuant to the election code. See id.

§ 232.015(a) (West, Westlaw through 2017 1st C.S.).

 6
 II. DISCUSSION

 By his first issue, O’Caña argues that Salinas “failed to prove” that the number of

illegal votes was equal to or greater than his margin of victory in the run-off election. We

construe the issue as challenging the legal sufficiency of the evidence to support the trial

court’s judgment.

A. Standard of Review

 In reviewing a judgment in an election contest, we must determine if the trial court

abused its discretion. McCurry v. Lewis, 259 S.W.3d 369, 372 (Tex. App.—Amarillo 2008,

no pet.); Gonzalez v. Villarreal, 251 S.W.3d 763, 774 (Tex. App.—Corpus Christi 2008,

pet. dism’d). A trial court abuses its discretion when it acts “without reference to any

guiding rules and principles.” Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,

241–42 (Tex. 1985). “The sufficiency of evidence supporting a trial court’s finding of fact

may be a relevant factor in determining whether the court abused its discretion.” Jones

v. Morales, 318 S.W.3d 419, 423 (Tex. App.—Amarillo 2010, pet. denied). In reviewing

the legal sufficiency of the evidence under a clear and convincing standard, we look at all

the evidence, in the light most favorable to the judgment, to determine if the trier of fact

could reasonably have formed a firm belief or conviction that its finding was true. In re

J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We presume that the trier of fact resolved

disputed facts in favor of its findings if a reasonable trier of fact could do so. Id. We

disregard any contrary evidence if a reasonable trier of fact could do so, but we do not

disregard undisputed facts. Id.

 “[D]espite the heightened [clear and convincing] standard of review,” we “must

nevertheless still provide due deference to the decisions of the factfinder, who, having full

 7
opportunity to observe witness testimony first-hand, is the sole arbiter when assessing

the credibility and demeanor of the witnesses.” In re A.B., 437 S.W.3d 498, 503 (Tex.

2014).

B. Applicable Law

 In an election contest, the trial court must “attempt to ascertain whether the

outcome of the contested election, as shown by the final canvass, is not the true outcome

because,” as pleaded in this case, “illegal votes were counted.” TEX. ELEC. CODE ANN.

§ 221.003(a)(1). An “illegal vote” is “a vote that is not legally countable.” Id. § 221.003(b).

An election contestant has the burden of proving by clear and convincing evidence that

voting irregularities were present and that they materially affected the election’s results.

Flores v. Cuellar, 269 S.W.3d 657, 660 (Tex. App.—San Antonio 2008, no pet.);

Gonzalez, 251 S.W.3d at 773.

 Under election code chapter 86, a person casting a mail-in ballot who would be

eligible to receive assistance at a polling place4 may select a person to assist the voter in

preparing the ballot. TEX. ELEC. CODE ANN. § 86.010(a). Any assistance given to a mail-

in voter is limited to that which is authorized by the election code for voters at a polling

place,5 except that a mail-in voter “with a disability who is physically unable to deposit the

ballot and carrier envelope in the mail may also select a person . . . to assist the voter by

depositing a sealed carrier envelope in the mail.” Id. § 86.010(b). If a person assists a

 4A voter is eligible to receive assistance at a polling place “if the voter cannot prepare the ballot
because of: (1) a physical disability that renders the voter unable to write or see; or (2) an inability to read
the language in which the ballot is written.” TEX. ELEC. CODE ANN. § 64.031 (West, Westlaw through 2017
1st C.S.). If assistance is provided to a voter who is not eligible for assistance, the voter’s ballot may not
be counted. Id. § 64.037 (West, Westlaw through 2017 1st C.S.).
 5Forms of polling place assistance authorized by the election code include: (1) reading the ballot
to the voter; (2) directing the voter to read the ballot; (3) marking the voter’s ballot; and (4) directing the
voter to mark the ballot. Id. § 64.0321 (West, Westlaw through 2017 1st C.S.).

 8
voter, the assistant must sign the written oath that is part of the certificate on the voter’s

official carrier envelope. Id. § 86.010(c). If a voter is assisted in violation of these rules,

the voter’s ballot may not be counted. Id. § 86.010(d).

 Chapter 86 also provides that a person commits an offense by knowingly

possessing an official ballot or carrier envelope provided to another, unless the person:

(1) is lawfully assisting a voter who is eligible for assistance; and (2) has complied fully

with the requirements of the chapter, which include the provision of the person’s name,

address, and signature on the reverse side of the envelope. Id. §§ 86.0051(b) (West,

Westlaw through 2017 1st C.S.), .006(f)(4).6 A ballot returned in violation of section

86.006 may not be counted. Id. § 86.006(h).

 It is a second-degree felony offense for a person to intentionally or knowingly offer,

confer, or agree to confer on another, or solicit, accept, or agree to accept from another,

any benefit as consideration for the recipient’s vote. TEX. PENAL CODE ANN.

§ 36.02(a)(1).7

 If the court can ascertain the candidate for which an illegal vote was cast, the court

must subtract the vote from the candidate’s official total. TEX. ELEC. CODE ANN.

§ 221.011(a) (West, Westlaw through 2017 1st C.S.). If the court finds that illegal votes

were cast but cannot ascertain which candidate the illegal votes were cast for, it shall

 6 In general, section 86.006 is not applicable to a person who is: (1) related to the voter within the
second degree by affinity or the third degree by consanguinity; (2) physically living in the same dwelling as
the voter; (3) an early voting clerk or a deputy early voting clerk; (4) an employee of the United States Postal
Service working in the normal course of the employee’s authorized duties; or (5) a common or contract
carrier working in the normal course of the carrier’s authorized duties. Id. § 86.006(f)(1)–(3), (f)(5), (f)(6)
(West, Westlaw through 2017 1st C.S.).
 7 The parties appear to agree that a vote obtained by bribery is not legally countable, though they
cite no authority explicitly stating that proposition. We assume for purposes of this analysis that a vote
obtained by bribery is not legally countable.

 9
consider those votes in making its judgment. Id. § 221.001(b). If the number of illegal

votes is equal to or greater than the number of votes necessary to change the outcome

of an election, the court may declare the election void without attempting to determine

how individual voters voted. Id. § 221.009(b) (West, Westlaw through 2017 1st C.S.).

C. Waiver

 We first address Salinas’s contention, made in his appellate brief, that O’Caña

waived his legal sufficiency issues because he “does not directly attack or identify any

specific findings of fact he is challenging for legally insufficient evidence—rather, he

generally attacks the judgment and the evidence.” See In Interest of M.W., 959 S.W.2d

661, 664 (Tex. App.—Tyler 1997, writ denied) (“In an appeal from a nonjury trial, an attack

on the sufficiency of the evidence must be directed at specific findings of fact, rather than

at the judgment as a whole.”); Katz v. Rodriguez, 563 S.W.2d 627, 631 (Tex. Civ. App.—

Corpus Christi 1977, writ ref’d n.r.e.) (“Unless the trial court’s findings of fact are

challenged by point of error on appeal, . . . they are binding on the appellate court.”); see

also Milton M. Cooke Co. v. First Bank & Tr., 290 S.W.3d 297, 303 (Tex. App.—Houston

[1st Dist.] 2009, no pet.) (“[W]e will overrule a challenge to fact findings that form the basis

of a conclusion of law or disposition when the appellant does not challenge other fact

findings that support that conclusion or disposition.”).

 We disagree that the issues have been waived. Although O’Caña’s initial appellate

brief does not refer to individual findings of fact by number, the issues raised and the

arguments made in support thereof make clear that he is challenging the trial court’s

central findings regarding the quantity of illegal ballots cast. In particular, O’Caña’s first

issue disputes the finding that more than 158 illegal votes were counted. Further, there

 10
are no unchallenged findings of fact which would independently support the judgment.

Cf. Milton M. Cooke Co., 290 S.W.3d at 303. Accordingly, the issues have not been

waived.

D. Spoliation Inference

 As part of our consideration of O’Caña’s first issue, we consider the arguments

made in his fifth issue, in which he contends that the trial court erred by making an

“adverse inference” against him based on his testimony that he deleted text messages

on his phone “[b]efore, during, and after” the election contest was filed.

 We review the trial court’s legal determination of whether a party spoliated

evidence for an abuse of discretion. Brookshire Bros. v. Aldridge, 438 S.W.3d 9, 27 (Tex.

2014). The party seeking a remedy for spoliation must demonstrate that the other party

breached its duty to preserve material and relevant evidence. Id. at 20. A duty to

preserve evidence exists when (1) a party knows or reasonably should know that there is

a substantial chance a claim will be filed; and (2) the evidence is relevant and material.

Id.; Miner Dederick Const., LLP v. Gulf Chem. & Metallurgical Corp., 403 S.W.3d 451,

465 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). A party knows or reasonably

should know that there is a substantial chance a claim will be filed if a reasonable person

would conclude from the severity of the incident, and other circumstances surrounding it,

that there was a substantial chance for litigation at the time of the alleged spoliation.

Miner Dederick, 403 S.W.3d at 465. A “substantial chance of litigation” arises when

“litigation is more than merely an abstract possibility or unwarranted fear.” Brookshire

Bros., 438 S.W.3d at 20.

 In this case, O’Caña testified that, as a matter of routine practice, he deleted some

 11
texts from his phone, including some from people associated with his campaign and

alleged to have engaged in bribery and harvesting. He stated he deleted the texts “before,

during, and after” the election contest suit was filed. Salinas did not request a spoliation

inference during trial—instead, he first suggested it in his proposed conclusions of law.

The trial court found that “O’Caña and/or his agents[8] intentionally destroyed the

correspondence . . . in order to conceal relevant evidence,” but the court refused to make

an explicit finding that O’Caña had a duty to preserve evidence at the time he deleted the

texts, despite the fact that Salinas included exactly such a finding in his proposed

conclusions of law.

 We find no evidence in the record that litigation was more than “an abstract

possibility” prior to the time the election contest suit was filed; accordingly, O’Caña had

no duty to preserve communications prior to that time. See id. There was no evidence

that Salinas requested a recount, and he did not file his election contest until 39 days

after the election was held. Further, we find no direct evidence in the record establishing

that the texts which O’Caña deleted after the contest was filed were in any way relevant

to any issues within the court’s scope of inquiry in the election contest. See Diaz v.

Valadez, 520 S.W.2d 458, 459 (Tex. Civ. App.—Corpus Christi 1975, no writ) (noting that

“in an election contest only such matters happening on the day of the election and

pertaining strictly to the election may be inquired into or determined by the trial court”);

see also Estrada v. Adame, 951 S.W.2d 165, 168 n.2 (Tex. App.—Corpus Christi 1997,

orig. proceeding) (same). Intentional spoliation “may, absent evidence to the contrary,

 8 There is no evidence in the record that anyone other than O’Caña himself deleted

correspondence.

 12
be sufficient by itself to support a finding that the spoliated evidence is both relevant and

harmful to the spoliating party.” Brookshire Bros., 438 S.W.3d at 15. But here, Salinas’s

counsel did not ask O’Caña, Lara, or any other witness about the content of the deleted

texts, nor did he show that the content of those texts was undiscoverable by other

methods. Moreover, O’Caña testified that he deletes his text messages and emails on a

regular basis because he “get[s] over a thousand text messages constantly, emails the

same thing.” Because he regularly deleted his texts and emails, any such

correspondence remaining after the election contest was filed would not have constituted

evidence of a “conspiracy” to obtain illegal votes arising prior to the election, as Salinas

alleges.

 We find that Salinas failed to meet his burden to show that O’Caña breached a

duty to preserve material and relevant evidence. See id. at 20. The trial court could not

have reasonably concluded merely from O’Caña’s testimony that O’Caña harbored the

specific intent to “conceal discoverable evidence” when he deleted the texts at issue. See

Knoderer v. State Farm Lloyds, 515 S.W.3d 21, 35 (Tex. App.—Texarkana 2017, pet.

denied).

 We note further that, while the trial court’s discretion to remedy an act of spoliation

is broad, it is not limitless. Petroleum Sols., Inc. v. Head, 454 S.W.3d 482, 489 (Tex.

2014). In the jury trial context, a trial court may only submit a spoliation instruction “if it

finds (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the

spoliating party acted negligently and caused the nonspoliating party to be irreparably

deprived of any meaningful ability to present a claim or defense.” Knoderer, 515 S.W.3d

at 35; see Brookshire Bros., 438 S.W.3d at 23 (“A party must intentionally spoliate

 13
evidence in order for a spoliation instruction to constitute an appropriate remedy.”).

Therefore, as with any sanction, before instructing a jury on spoliation, the trial court must

find “that a lesser remedy would be insufficient to ameliorate the prejudice caused by the

spoliating party’s conduct.” Brookshire Bros., 438 S.W.3d at 19.

 A spoliation inference is a sanction akin to a jury instruction. And here, in light of

the fact that there was direct evidence of only 31 illegal votes in an election with a victory

margin of 157, the spoliation inference likely had a major influence on the trial court’s final

ruling—and it may even have been dispositive. See id. at 23 (observing that the

submission of a spoliation instruction may, at least in some instances, be “tantamount to

a death-penalty sanction”).9 Nevertheless, there is no indication that any lesser sanctions

were considered or tested in this case, and the trial court did not make any finding that a

lesser remedy would be insufficient to ameliorate the prejudice that may have been

caused by O’Caña’s conduct. See id.

 The dissent suggests that “Salinas’s inability to question Veronica O’Caña may

serve as a basis to support” the spoliation inference. This suggestion goes far beyond

the trial court’s factual findings. It relies on an assumption that O’Caña or his attorney

controlled Veronica to the extent that they had the ability to compel her presence at trial,

a finding the trial court did not make and which is not supported by the record.

Regardless, the process server’s testimony regarding her failed attempts to serve

subpoenas on O’Caña’s family members does not support the trial court’s finding that “Dr.

 9 Salinas’s proposed conclusions of law regarding spoliation included: “While the evidence at trial
was sufficient to support the legal conclusions in this case, in addition to the evidence, the Court adopts an
adverse inference against the Contestee because Contestee spoliated evidence.” The trial court did not
adopt this conclusion, indicating that it did not necessarily believe the evidence was sufficient to support
the judgment without the spoliation inference.

 14
O’Caña and/or his agents intentionally destroyed the correspondence between Dr.

O’Caña and his campaign workers.” And neither Salinas nor the dissent cite any authority

establishing that a party’s inability to serve subpoenas on potential witnesses would

independently allow the trial court to make inferences adverse to the other party.

 Under these circumstances, we conclude that the trial court abused its discretion

by making an adverse inference based on intentional spoliation. We sustain O’Caña’s

fifth issue, and we do not consider the adverse inference in our legal sufficiency analysis.

E. Analysis

 O’Caña argues by his first issue that the evidence did not support the trial court’s

finding that more than 158 illegal ballots were cast in the June 9, 2018 mayoral run-off

election. He contends that, even if the trial court credited all the testimony regarding

alleged bribery and voting harvesting, the maximum number of illegal votes is less than

his victory margin of 158; therefore, the trial court could not have concluded that the

outcome of the election was unascertainable.10

 10 O’Caña argues by his third issue that there was no evidence of the results of the “final canvass”

of the election, and that this deficiency renders the judgment improper under the election code. See id.
§ 221.003(a)(1) (limiting the scope of the trial court’s inquiry in an election contest to ascertaining whether
the “outcome of the contested election, as shown by the final canvass, is not the true outcome . . . .”); but
see Slusher v. Streater, 896 S.W.2d 239, 242 (Tex. App.—Houston [1st Dist.] 1995, no writ) (finding no
abuse of discretion where trial court based its ruling on results according to unofficial recount rather than
official final canvass).
 In response, Salinas acknowledges that there was no evidence of the final canvass results but
asserts that the trial court could, and this Court may, take judicial notice of those results as they appear on
the Mission city website. See CITY OF MISSION, CANVASS OF ELECTION RETURNS, JUNE 9, 2018,
http://missiontexas.us/wp-content/uploads/2018/06/Canvass-Report.pdf (last visited March 29, 2019); see
also State ex rel. Lukovich v. Johnston, 228 S.W.2d 327, 328 (Tex. Civ. App.—Galveston 1950, writ dism’d)
(“It seems to be the settled law in this state that a trial court is required to take judicial notice of the fact that
a municipal election was held in the city in which the court is situated and the general result of the election.”).
Salinas further argues that, even if the trial court erred, that error was harmless because the final canvass
results are identical to the unofficial results as testified to by Korbel. See TEX. R. APP. P. 44.1(a).
 Assuming but not deciding that evidence of the final canvass results was required by the statute,
we conclude that such requirement was satisfied in this case. Although Korbel initially stated that he
obtained “unofficial” results from the Hidalgo County Elections Department, he later stated that his data
came from “[t]he canvas[s] of election returns” and that the data represented the “final” results of the

 15
 In response, Salinas notes that the direct testimony of the individual voters that

they were bribed or their ballots were harvested is not the only evidence of illegal votes

in this case. Instead, there was also circumstantial evidence supporting the trial court’s

finding that more than 158 illegal votes were counted. Specifically, Salinas points to

Korbel’s testimony, based on the timing of early votes and identity of assistants, that 48

voters were “likely” bribed; and his testimony, based on the stamps used on mail-in ballot

carrier envelopes, that anywhere from 27 to 303 ballots were illegally harvested.

 Salinas further points to Carmen Ochoa’s testimony as supportive of the judgment.

Ochoa stated that that she saw Lara carrying “a bunch of ballots in her hand” at an

assisted living facility for elderly residents. In addition to Ochoa’s testimony, Maribel

Salinas also testified that she saw Lara carrying a “bag” of mail-in ballots at an assisted

living facility. Salinas contends that Maribel’s testimony alone supports the judgment

since a “bag” of ballots could potentially “hold more than 150 ballots.”

 First, we consider evidence of bribed votes. By this Court’s count, five witnesses

testified directly that they were paid for their votes; those five witnesses further provided

clear, direct testimony establishing that eight other voters were paid for their votes. The

trial court did not abuse its discretion in finding by clear and convincing evidence that

these 13 votes were illegally cast.

 However, Korbel’s testimony regarding the “very likely” quantity of additional bribed

votes does not meet the exacting standard of “clear and convincing.” Korbel stated that

election. Further, Korbel testified that he and other election analysts use unofficial results “[b]ecause they’re
generally available” and they are “never” wrong “more than one vote one direction or the other.” The trial
court could have reasonably inferred from this testimony that the results used by Korbel in his analysis were
in fact the results of the election “as shown by the final canvass.” See TEX. ELEC. CODE ANN.
§ 221.003(a)(1). O’Caña’s third issue is overruled.

 16
48 early voters cast their ballots around the same time as the five voters who testified

they were paid, and were assisted by the same people as those five voters. Korbel opined

that all 48 voters were also paid; but he based that opinion on an “assumption” that “if you

pay one . . . you’re going to pay everybody and that’s the way the world works.” He did

not explain the underlying basis for this assumption, and though Korbel is undoubtedly

an expert in election analyses concerning racially polarized voting, there is nothing in his

background that would indicate an expertise in vote bribery. His testimony that “if you

pay one . . . you’re going to pay everybody” is unsupported by any factual basis or

underlying reasoning. This conclusory testimony is not probative. See City of San

Antonio v. Pollock, 284 S.W.3d 809, 818 (Tex. 2009) (noting that if no basis for an expert

opinion is offered, or the basis offered provides no support, the expert opinion is merely

a conclusory statement and cannot be considered probative evidence; i.e., a claim will

not stand or fall on the mere ipse dixit of a credentialed witness).

 We next turn to the issue of harvested ballots. Fourteen witnesses testified that

their mail-in ballots were picked up and deposited in the mail by unrelated people whose

signatures did not appear on the carrier envelope. There was also direct testimony of

four additional harvested ballots. Therefore, there was direct testimony as to 18

harvested ballots, and the trial court did not abuse its discretion in finding by clear and

convincing evidence that these votes were illegal.

 Considering direct evidence of both bribed votes and harvested ballots, there were

at most 31 votes for which there was clear and convincing evidence of illegality—far short

of the amount which would cast doubt on the results of the election. This case therefore

hinges on the circumstantial evidence of illegal votes.

 17
 That evidence includes Korbel’s opinion regarding the quantity of harvested

ballots, which was based on his analysis of the stamps appearing on the mail-in ballot

carrier envelopes. Korbel stated that there were 27 ballots known to have been

harvested, and each of their carrier envelopes had a folded-flag stamp which appeared

to come from a $50 roll. He stated, based on his examination of all mail-in carrier

envelopes in the run-off election, that 303 of those envelopes had the same folded-flag

roll stamp and were not signed by an assistant. He opined that “no poor person would

buy a roll of stamps for $50,” so the total number of illegally harvested ballots could be as

many as 303.11

 Korbel’s opinion was founded on several layered inferences and assumptions. In

particular, he seems to assume that all of the mail-in voters in Mission are “poor” and

therefore could not afford a $50 roll of stamps. This assumption was critical to Korbel’s

inference that some or all of the envelopes bearing the folded-flag roll stamp were subject

to illegal harvesting. Without this assumption, there would be no reason to believe that

an envelope bearing a particular type of stamp is any more or less likely to have been

cast due to illegal harvesting.

 Election code chapter 82 explains that a person is eligible to vote by mail-in ballot

if the person: (1) is 65 years of age or older on election day; (2) expects to be absent

from the person’s county of residence on election day and during the regular in-person

early voting hours; (3) has a sickness or physical condition that prevents appearance at

the polling place on election day without a likelihood of needing personal assistance or of

 11 Contrary to the trial court’s finding number 54, Korbel did not testify that this was the “likely” range

of harvested ballots; he stated that 27 was a minimum and 303 was a maximum.

 18
injuring the person’s health; or (4) is confined in jail and is otherwise eligible to vote. TEX.

ELEC. CODE ANN. §§ 82.001–.005 (West, Westlaw through 2017 1st C.S.). A mail-in voter

must meet one of these four conditions, but Korbel did not elucidate any reason to assume

that a mail-in voter must be economically destitute. His testimony to that effect was

merely his ipse dixit, and it is non-probative for that reason. See City of San Antonio v.

Pollock, 284 S.W.3d at 881. Korbel also appears to have assumed that all illegally

harvested votes were cast in favor of O’Caña. However, many of the witnesses that

testified their ballots were illegally harvested did not specify who they voted for; and of

those who did testify as to who they voted for, more stated they voted for Salinas than for

O’Caña.12

 Even assuming that no Mission voters are capable of affording a $50 roll of stamps,

Korbel’s testimony simply did not justify a reasonable inference that, if a mail-in ballot

contains a stamp from a $50 roll and no assistant’s signature, that stamp must have been

placed there by an unauthorized person. This conclusion does not rest, as the dissent

argues, on an implicit assumption that 357 voters “each individually and independently

purchased a $50 roll of identical stamps.” It was Salinas’s burden to establish the

requisite number of illegal votes by clear and convincing evidence. See Flores, 269

S.W.3d at 660. The evidence showed that there were 303 envelopes with rolled folded-

 12 As stated above, there was direct testimony of 18 harvested ballots. According to the trial
testimony, six of the harvested ballots were Salinas votes, two were O’Caña votes, and the remainder were
unidentified. The dissent argues that “it is immaterial to our legal sufficiency analysis that there was some
evidence that the Salinas campaign may have also engaged in improper campaign conduct.” It is true that,
when the number of illegal votes is equal to or greater than the number necessary to change the outcome,
the trial court is permitted to invalidate the election results without determining how individual voters voted.
Id. § 221.009(b) (West, Westlaw through 2017 1st C.S.). But here, due to the dearth of direct evidence of
illegal votes relative to the victory margin, Salinas’s argument that the number of illegal votes exceeded the
threshold in this case relies on his allegation of a “conspiracy” by O’Caña campaign workers to bribe voters
and harvest ballots. The apparently uncontested fact that a plurality of the illegally harvested ballots proven
at trial were actually cast for Salinas is surely relevant to whether such a “conspiracy” existed.

 19
flag stamps that did not contain an assistant’s signature, but Korbel seems to have

entertained only two possibilities for why that may have occurred: (1) each of the 303

voters individually and independently purchased a $50 roll of identical stamps, or (2)

rampant fraud occurred. Korbel’s inference that all of those ballots may have been

illegally harvested was based entirely on his assumption that, because the first possibility

is highly unlikely, the second possibility must be the truth. This is a false dichotomy,

however, because there are other eminently plausible reasons for this scenario which

comport with the law. For example, a mail-in voter could have personally brought a

completed ballot to a post office and purchased an individual stamp from a clerk; or a

mail-in voter could have given his or her ballot to a family member or co-dweller to stamp

and mail. See TEX. ELEC. CODE ANN. § 86.006(f)(1), (2). In either case, the existence of

a rolled folded-flag stamp on the voter’s carrier envelope would say absolutely nothing

about whether the ballot was illegally harvested or otherwise not legally countable.

 There was other circumstantial evidence upon which the trial court found more

than 13 bribed votes. In particular, O’Caña stated that his campaign paid over $25,000

to his niece’s newly-established political consulting firm, but he did not obtain any

documentation showing how the firm spent the funds. In addition, as noted, Ochoa and

Maribel Salinas each testified that they saw Lara carrying a bag of ballots. At trial, Ochoa

guessed that Lara was carrying around 200 ballots.13 O’Caña argues that Ochoa’s

estimate of the quantity of ballots possessed by Lara could not serve as clear and

convincing evidence because Ochoa characterized that testimony as a “guess.” 14 We

 13 As noted, Lara testified at trial that she was working for Salinas during the run-off election.
 14The dissent suggests that Ochoa described only her first assessment of the number of ballots
Lara was carrying—“20 to 40”—as a “guess.” From our reading of the record of Ochoa’s translated

 20
agree. “[F]indings based on evidence that allows for no more than speculation—a

guess—are based on legally insufficient evidence.” Serv. Corp. Int’l v. Guerra, 348

S.W.3d 221, 229 (Tex. 2011). Though we must defer to the trial court’s credibility

determinations, we cannot say that Ochoa’s “guess,” even when combined with Maribel

Salinas’s testimony and the other circumstantial evidence, constitutes “clear and

convincing” evidence that more than 18 O’Caña votes were illegally harvested.

 After considering the entire record, we conclude that there was legally insufficient

evidence to support the trial court’s finding, by clear and convincing evidence, that the

number of illegal votes is equal to or greater than the number of votes necessary to

change the outcome of the election. See TEX. ELEC. CODE ANN. § 221.012(b). The trial

court could not have formed a firm belief or conviction in this finding based only on the

evidence adduced at trial. See In re J.F.C., 96 S.W.3d at 266. In light of the foregoing,

we further conclude that the trial court abused its discretion in rendering judgment voiding

the election results. See McCurry, 259 S.W.3d at 372. O’Caña’s first issue is sustained.

We need not address his other issues as they are not dispositive. See TEX. R. APP. P.

47.1.

 III. CONCLUSION

 Election fraud perverts democracy and constitutes a grave offense, not only

against the opposing candidate but against society as a whole. Still, in an era when State

and federal elected officials seek to sow doubt and mistrust of government by grossly

exaggerating the prevalence of illegal voting, we must also remain vigilant to safeguard

testimony, we believe Ochoa also described her trial estimate of “around 200” as a “guess.”

 21
a voter’s right to have his or her lawful vote counted. The Texas Legislature has

prescribed a heightened standard of proof in election contests for precisely this reason.15

 This case has uncovered clear and convincing evidence of election fraud, resulting

in at least 31 illegal ballots being cast. This is extremely troubling. But the evidence in

this case showed that both candidates benefitted from these irregularities. In any event,

our inquiry in this proceeding is not to determine whether crimes have been committed,

nor is it to determine whether there was a “conspiracy” to obtain illegal votes, as Salinas

alleges—we confidently leave those questions to the able hands of the criminal justice

system. Our sole task here is to decide whether the trial court abused its discretion in

finding clear and convincing evidence of more than 157 illegal votes. As illustrated herein,

the trial court’s conclusion relied on unreasonable inferences and unsupported

assumptions. To find that a rational trier of fact could have formed a “firm belief or

conviction” that 157 illegal votes were cast, based on this record, would contravene the

legislature’s clear intent that strong, clear proof must be adduced before a facially valid

vote is discarded. Accordingly, in light of the entire record—and mindful of our solemn

duty to preserve and protect the integrity of the election process through faithful

 15 The dissent is correct that we must presume the legislature enacted the “clear and convincing”
standard for election contests with complete knowledge of existing law, which includes the common law
tenets that ordinary fraud is often proved with circumstantial evidence only, that we review the totality of the
evidence and avoid isolating evidence, and that we defer to reasonable assumptions and inferences. See
Ford Motor Co. v. Castillo, 444 S.W.3d 616, 622 (Tex. 2014); City of Keller v. Wilson, 168 S.W.3d 802,
813–14 (Tex. 2005); Acker v. Tex. Water Comm’n, 790 S.W.2d 299, 301 (Tex. 1990). The dissent seems
to additionally suggest that, because the legislature was aware of these common law precepts when it
enacted the “clear and convincing” standard, it must have intended for those tenets to apply equally to
election contests. But Castillo, City of Keller, and Acker were not election contests. And despite being
aware of the existing law, the legislature nevertheless chose to require a heightened standard for election
contests, thereby reflecting its unmistakable intent that election contests be treated differently. In any event,
even assuming the common law rules apply equally to election contests, we are under no obligation to
defer to assumptions and inferences which are unreasonable in light of the entire record.

 22
application of the law—we cannot say that the trial court acted within its discretion when

it concluded that the heightened standard has been met in this case.

 We reverse the trial court’s judgment declaring the results of the June 9, 2018

Mission mayoral run-off election void, and we render judgment denying Salinas’s election

contest suit. In order to expedite final resolution of this matter, no motion for rehearing

will be entertained. See TEX. ELEC. CODE ANN. § 232.014(e) (West, Westlaw through

2017 1st C.S.).

 DORI CONTRERAS
 Chief Justice

Dissenting Memorandum Opinion by
Justice Hinojosa.

Delivered and filed the
29th day of March, 2019.

 23